| | | |
|---|---|---|
| KOURSA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 CV 00746 |
| v. | ) | |
| | ) | Chief Judge Ruben Castillo |
| MANROLAND, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This action arises from a contract between Koursa, Inc. ("Koursa") and manroland, Inc. ("manroland") for the purchase and sale of a certain printing press system (the "Printing Press") manufactured by manroland AG. (R. 1, Compl. ¶¶ 5-6-; R. 25, manroland's Answer ¶¶ 5-6.) Koursa brings this action against manroland for anticipatory breach of contract and repudiation of contract, (R. 1, Compl. ¶¶ 29-49), and manroland brings a counterclaim against Koursa for breach of contract and anticipatory repudiation, (R. 25, manroland's Countercl. ¶¶ 24-38). Presently before the court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (R. 37, manroland's Mot. Summ. J.; R. 44, Koursa's Mot. Summ. J.) For the reasons discussed below, both parties' motions are denied.

## RELEVANT FACTS

### I.    Local Rules

Before summarizing the material facts that give rise to this action, the Court briefly discusses Local Rule 56.1 of the Northern District of Illinois, which imposes "certain requirements for supporting and opposing motions for summary judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1 assists the

Court "by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon*, 233 F.3d at 527 (quoting *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999) (internal quotation marks omitted)). The Seventh Circuit has emphasized that Local Rule 56.1 is "not a mere formality." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)). It "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Id.* (quoting *Waldridge*, 24 F.3d at 923-24).

Local Rule 56.1 requires a party moving for summary judgment to submit, among other things, a statement of undisputed material facts consisting of "short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a)(3). The opposing party must then submit, among other things, a concise response to the movant's statement of facts containing "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "Unless controverted in this manner, "all material facts set forth in movant's statement are deemed admitted." *Bordelon*, 233 F.3d at 527 (discussing Local Rule 12(N), the precursor to Local Rule 56.1). "Thus, a general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Further, a Rule 56.1(b)(3) response "is not the place for purely argumentative denials," *Malec*, 191 F.R.D. at 584, nor is it the place for additional facts,

*Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, (7th Cir. 2008) (A district court "does not abuse its discretion when it opts to disregard facts presented in a manner that does follow the Rule's instructions.") (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995)); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (concluding that district court did not abuse its discretion when it disregarded additional facts that the opposing party presented in its Local Rule 56.1(b)(3) response).

Instead, the non-moving party must submit a separate "statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C). "If additional material facts are submitted by the opposing party . . . the moving party may submit a concise reply" that satisfies the same requirements as the opposing party's response. L.R. 56.1(a); *Malec*, 191 F.R.D. at 584. A party's failure to reply to an opposing party's statement of additional facts is the admission of the opposing party's factual contentions. L.R. 56.1(a) (final unnumbered paragraph); *Malec*, 191 F.R.D. at 584; *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003.) Furthermore, the Seventh Circuit has consistently and repeatedly upheld a district court's discretion to require strict compliance with Local Rule 56.1. *Bordelon*, 233 F.3d at 527 (citing *Midwest Imports, Ltd.*, 71 F.3d at 1316; *Waldridge*, 24 F.3d at 922); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008). With these tenets in mind, the Court turns to the relevant facts.

## II.    Facts[1]

Koursa is a Pennsylvania corporation with its principal place of business in Fort Washington, Pennsylvania.  (R. 48, Koursa's Rule 56.1 Resp. ¶ 1; R. 50, manroland's Rule 56.1 Resp. ¶ 1.)  Koursa is in the business of leasing printing equipment to third parties, such as Kappa Graphics, LP ("Kappa"), a sister company.  (R. 50, manroland's Rule 56.1 Resp. ¶ 1.)  Manroland is a Delaware corporation with its principal place of business in Westmont, Illinois.  (R. 48, Koursa's Rule 56.1 Resp. ¶ 1; R. 50, manroland's Rule 56.1 Resp. ¶ 2.)  Manroland acts as the United States' sales representative for manroland AG, which manufactures printing presses.  (R. 50, manroland's Rule 56.1 Resp. ¶ 13.)  Manroland AG, a German company, is manroland's parent.  (R. 50, manroland's Rule 56.1 Resp. ¶ 13.)  The Printing Press at issue was manufactured in Germany by manroland AG.  (R. 50, manroland's Rule 56.1 Resp. ¶ 13.)  On October 6, 2011, Chris Howes ("Howes"), a manroland employee, (*see* R. 48, Koursa's Rule 56.1 Resp. ¶ 16), informed Nils Kaben, a manroland AG employee, (*see* R. 50, manroland's Rule 56.1 Resp. ¶ 66), "Kappa has told us that if we cannot have the [Printing] Press on their floor by the end of December 2011 we will not get the deal," (R. 46, Koursa's Facts, Ex. 6, MANR000342).

---

[1]  **The Court takes the undisputed facts from the parties' Local Rule 56.1 statements of material facts.  (R. 39, manroland's Local Rule 56.1(a)(3) Statement of Material Facts ("manroland's Facts"); R. 48, Koursa's Local Rule 56.1(b)(3) Response to manroland's Local Rule 56.1(a)(3) Statement of Material Facts ("Koursa's Rule 56.1 Resp."); R. 52, Koursa's Statement of Additional Facts that Require Denial of manroland's Motion for Summary Judgment ("Koursa's Add'l Facts"); R. 46, Koursa's Local Rule 56.1(a)(3) Statement of Material Facts ("Koursa's Facts"); R. 50, manroland's Local Rule 56.1(b)(3) Response to Koursa's Local Rule 56.1(a)(3) Statement of Material Facts ("manroland's Rule 56.1 Resp."); R. 51, manroland's Statement of Additional Facts in Support of its Response to Koursa's Motion for Summary Judgment ("manroland's Add'l Facts")).  Although manroland did not reply to Koursa's statements of additional facts (R. 52), the Court notes that they are nearly identical to Koursa's statement of material facts (R. 46).  Therefore, the Court has taken manroland's response to Koursa's statement of material facts (R. 50) into account when reviewing Koursa's additional facts.**

## A.     The terms of the Machinery Contract

On October 20, 2011, Koursa and manroland executed a "Machinery Contract" in which

manroland agreed to sell to Koursa a Printing Press.  (R. 48, Koursa's Rule 56.1 Resp. ¶ 3; R. 50,

manroland's Rule 56. 1 Resp. ¶ 5.)  Manroland AG was not a party to the Machinery Contract.

(R. 48, Koursa's Rule 56.1 Resp. ¶ 4.)  William J. Bonner, Jr., Esq., Vice President of Koursa,

negotiated the terms of the Machinery Contract on behalf of Koursa, and Michael Mugavero

negotiated the Machinery Contract on behalf of manroland.  (R. 50, manroland's Rule 56.1 Resp.

¶ 6; R. 48, Koursa's Rule 56.1 Resp. ¶ 15.)  The total purchase price for the Printing Press was

$3,205,400.00, payable to manroland in installments.  (R. 48, Koursa's Rule 56.1 Resp. ¶ 5.)

The Machinery Contract specifies the following payment schedule:

| | | |
|---|---|---|
| **Purchase Price** | **USD$** | **3,205,400.00** |
| **Tax-Exempt: Certificate number** | TBP | |
| 10% - Down payment with contract | USD$ | 317,500.00 |
| 35% - Prior to shipment ex works | USD$ | 1,124,930.00 |
| 25% - Upon delivery to the purchasers [sic] premises | USD$ | 801,350.00 |
| 15% - Upon completion of installation | USD$ | 480,810.00 |
| 15% - 30 days after start of commercial operation | USD$ | 480,810.00 |

(R. 1-1, Machinery Contract, Addendum A; R. 48, Koursa's Rule 56.1 Resp. ¶ 5.)  Koursa paid

manroland $317,500.00 at the time it executed the Machinery Contract.  (R. 50, manroland's

Rule 56.1 Resp. ¶ 7.)

Under the "General Terms and Conditions" heading and the "Delivery" subheading

therein, the Machinery Contract specifies:

FOB Customer
The Equipment shall be delivered to the Kappa Graphics, LP's loading dock at its
Premises after completion of the preparation of the Premises.

Kappa Graphics, LP's facility shall be ready to accept delivery including having a
suitable foundation completed as well as available and suitable electrical power,
compressed air, water and gas no later than 30 days prior to installation.

> The unloading of the Equipment, and rigging to the final site, is included in the
> Net Investment.

(R. 1-1, Machinery Contract at 7; R. 50, manroland's Rule 56.1 Resp. ¶ 10.)  Under the

subheading "Delivery date," the Machinery Contract states: "Delivery to Kappa Graphics, LP's

facility on or before December 31, 2011.  Manroland reserves the right to delay, without penalty,

in the case that payments are not settled by the Purchaser when due."  (R. 1-1, Machinery

Contract at 7.)  Section 7.16 of the Machinery Contract also provides that "[i]f delivery of the

[Printing Press], excluding the RS 105 Inline Sheeter, is later than the Delivery Date of 12/31/11

due to [manroland] (other than one of the causes provided in 7.15) then [Koursa] shall have the

right to terminate this Agreement and [manroland] shall thereupon return all of [Koursa's]

payments with interest."  (R. 1-1, Machinery Contract at 22; R. 50, manroland's Rule 56. 1 Resp.

¶ 11.)  Section 7.15 governs delay or nonperformance under the Machinery Contract and excuses

both Koursa and manroland from liability for any delay or failure to perform "due to acts of

God, work stoppages or slowdowns by its employees or agents, fires or governmental

intervention."  (R. 1-1, Machinery Contract at 22; R. 52, Koursa's Add'l Facts ¶ 5.)  The parties

negotiated Section 7.15, and prior to signing the Machinery Contract, they removed language

from an earlier draft that exempted manroland from liability due to "shortages of labor or

materials."  (R. 52, Koursa's Add'l Facts ¶ 6; R. 52, Koursa's Add'l Facts, Ex. 8,

KOURSA000650.)

Notably, Section 7.5 of the Machinery Contract provides that "[t]itle to and risk of loss of

the Equipment shall pass from Seller to Purchaser when the Equipment is delivered to

Purchaser's receiving dock."  (R. 1-1, Machinery Contract at 19; R. 50, manroland's Rule 56.1

Resp. ¶ 8.)  The Machinery Contract also provides that manroland agreed to provide 300 hours

of training and limited warranty support for an additional year.  (R. 50, manroland's Rule 56.1

Resp. ¶ 12; R. 1-1, Machinery Contract at 7.)  In addition, manroland was to provide Koursa with certain price concessions for parts for a 24-month period. (R. 50, manroland's Rule 56.1 Resp. ¶ 12; R. 1-1, Machinery Contract at 7.)

Section 7.1 provides that in the event any payment thereunder due from Koursa to manroland is received by manroland more than ten days after Koursa's receipt of written notice of non-payment from manroland (a "Delinquent Payment"), Koursa shall pay a late charge equal to five percent (5%) of the Delinquent Payment for each month (or partial month) the Delinquent Payment is not received by manroland.  (R. 48, Koursa's Rule 56.1 Resp. ¶ 9; R. 1-1, Machinery Contract at 18.)  Section 7.4 of the Machinery Contract provides that Koursa shall accept delivery of the Printing Press on or before December 31, 2011.  (R. 48, Koursa's Rule 56.1 Resp. ¶ 10; R. 1-1, Machinery Contract at 19.)  If Koursa does not so accept delivery for a cause other than one of the causes provided in Section 7.15, then manroland may, among other things, declare the full unpaid balance of the Purchase Price immediately due and payable, (R. 48, Koursa's Rule 56.1 Resp. ¶ 10; R. 1-1, Machinery Contract at 19), and "shall be entitled to immediate payment of 15% of the Purchase Price as liquidated damages," (R. 1-1, Machinery Contract at 23).  The parties further agreed in Section 7.17(a) that if Koursa cancelled the Machinery Contract, it would pay manroland "any additional amounts necessary to bring the aggregate amount[] received by [manroland] from [Koursa] under this [Machinery] Contract to forty-five percent (45%) of the Purchase Price."  (R. 48, Koursa's Rule 56.1 Resp. ¶ 8; R. 1-1, Machinery Contract at 23.)

The Machinery Contract includes an indemnification clause whereby both Koursa and manroland agreed to indemnify each other against, among other things, damages arising out of or relating to the Printing Press and its sale that are due to a breach of a duty or other contractual

obligation.  (R. 1-1, Machinery Contract at 19; R. 48, Koursa's Rule 56.1 Resp. ¶ 11.)  The

Machinery Contract also contains a choice of law and venue provision providing that it "shall be

governed by and construed in accordance with the laws of the State of Illinois. . . . Except as to

actions by [manroland] against [Koursa], . . . [manroland and Koursa] hereby consent and agree

to the exclusive jurisdiction of . . . the federal court in the Northern District of Illinois."  (R. 1-1,

Machinery Contract at 25.)

### B.    Time for delivery and unloading

Again, Mugavero and Bonner both negotiated the terms of the Machinery Contract on

behalf of manroland and Koursa, respectively.  (R. 50, manroland's Rule 56.1 Resp. ¶ 6.)

Mugavero testified that a condition of the contract, as he remembered, was that the Printing

Press would be delivered, taken out of the container, and placed on Kappa's floor on or before

December 31, 2011.  (R. 46, Koursa's Facts, Ex. 5, Aug. 21, 2012 Michael Mugavero Dep. at

54:7-10.)  Bonner testified that it was understood that delivery included the delivery, the

unloading and the set-up of the Printing Press on the floor.  (R. 46, Koursa's Facts, Ex. 3, Sept.

25, 2012 William Bonner Dep. at 49:3-19, 50:22-51:11.)

After Koursa and manroland executed the Machinery Contract, manroland assigned

Richard Brown as the senior project manager to facilitate delivery and installation of the Printing

Press.  (R. 50, manroland's Rule 56.1 Resp. ¶ 15.)  After holding project kick-off meeting on

November 8, 2011, Brown wrote to Kaben and said that Kappa "wants and expects per the

[Machinery] Contract to get all of the [Printing P]ress parts delivered to his plant by

12/31/2011."  (R. 46, Koursa's Facts, Ex. 7, MANR002010.)  Brown also wrote, "We need to

have all of the major equipment in the plant by by 12/31/2011."  (*Id.*)

Between November 1 and 3, manroland employees had internally discussed a possible schedule for production and shipping. (R. 46, Koursa's Facts, Ex. 39, MANR001918-19.) After the Printing Press was fabricated, it was to be packed into approximately eight cargo containers and transported from manroland AG's factory in Offenbach, Germany, to a port in Antwerp, Belgium. (R. 50, manroland's Rule 56.1 Resp. ¶ 14.) Under the internal manroland schedule, the Printing Press was expected to leave the factory on December 7, 2011, and it would need to arrive at the port in Antwerp, Belgium by December 9, 2011, so that it could leave the port on a vessel named the Santa Bettina on December 14, 2011. (R. 46, Koursa's Facts, Ex. 39, MANR001918-19.) From there, the cargo containers were to be loaded onto a cargo vessel that would arrive at one of the ports near New York City on December 22, 2011. (R. 50, manroland's Rule 56.1 Resp. ¶ 14; R. 46, Koursa's Facts, Ex. 5, Mugavero Dep. at 77:7-12; R. 46, Koursa's Facts, Ex. 39, MANR001918-19.) The cargo containers would then be offloaded, and after clearing customs, each of the cargo containers were to be driven to Kappa's facility in Pittston, Pennsylvania. (R. 50, manroland's Rule 56.1 Resp. ¶ 14.)

Brown told Nick Smith, the general manager of Kappa, that the unloading of the Printing Press would take three or four days because, among other things, space limitations dictated that only one truck could be unloaded at a time at Kappa's unloading area. (R. 50, manroland's Rule 56.1 Resp. ¶ 16.) Brown created a scheduling "Gantt" chart that provided four days—from December 27 to December 30, 2011—to unload and stage the "Manroland Equip." (R. 50, manroland's Rule 56.1 Resp. ¶ 17; R. 46, Koursa's Facts, Ex. 11, KOURSA000337.) Brown also received a proposal from a rigging company which provided four days to: "1. Unload component crates and skids from the carrier's flatbed trucks and move/rig into the building via the existing ground level door access. 2. Begin uncrating and staging components as time

allows. 3. Consolidate crating debris for disposal by others." (R. 50, manroland's Rule 56. 1 Resp. ¶ 17; R. 46, Koursa's Facts, Ex. 12, MANR000240.) Indeed, on January 5, 2012, manroland created another Gantt schedule indicating that it would take four days to off load the Printing Press at Kappa's facilities. (R. 46, Koursa's Facts, Ex. 13, MANR006566.)

If necessary, manroland could have arranged to have the Printing Press shipped to Kappa's facility via air-freight. (R. 51, manroland's Add'l Facts ¶ 1.) Because the Printing Press never shipped, there are no documents or charts indicating that the unloading could be accomplished in less than four days. (R. 50, manroland's Rule 56.1 Resp. ¶ 18.)

**C.    manroland AG's bankruptcy**

On November 25, 2011, manroland AG filed for bankruptcy. (R. 50, manroland's Rule 56.1 Resp. ¶ 19; R. 48, Koursa's Rule 56.1 Resp. ¶ 14.) That same day, a representative for a competitor of manroland notified Smith about manroland AG's bankruptcy. (R. 50, manroland's Rule 56.1 Resp. ¶ 19, MANR002424-26; R. 46, Koursa's Facts, Ex. 9, Aug. 21, 2012 Nicholas Smith Dep. 23:19-23.) That evening, Smith e-mailed Nick Karabots a press release about manroland AG's insolvency and stated, "Not sure what this means to us and have not been able to get a hold of Mike Mugavero." (R. 46, Koursa's Facts, Ex. 14, KOURSA000733.) That same evening, Smith forwarded to Mugavero an e-mail containing a link to an article about manroland AG's bankruptcy and asked, "What's with this?" (R. 46, Koursa's Facts, Ex. 17, MANR002424-26.) Smith also e-mailed a separate manroland employee, Al Muccari, the following: "Heard that MAN Roland filed for bankruptcy today . . . what does this mean for us?" (R. 50, manroland's Rule 56.1 Resp. ¶ 23; R. 46, Koursa's Facts, Ex. 16, KOURSA000103.) Smith testified that prior to sending e-mails to Mugavero and Muccari, he first called them, but

when he did not get a call back he e-mailed them. (R. 50, manroland's Rule 56. 1 Resp. ¶ 23; R. 46, Koursa's Facts, Ex. 9, Smith Dep. 22:10-23:1.)

Smith, who had been communicating with manroland on behalf of Koursa, had previously sought to purchase equipment from a German bankruptcy estate, but subsequently abandoned his efforts when it took months to get any information from the bankruptcy administrator. (R. 50, manroland's Rule 56.1 Resp. ¶ 20.) Smith testified that from the moment of manroland AG's insolvency, Koursa had a growing concern about manroland's ability to deliver the Printing Press to Kappa by December 31, 2011. (R. 50, manroland's Rule 56.1 Resp. ¶ 20; R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 29:2-15.) Bonner testified that because manroland AG manufactured the Printing Press, he believed that Koursa "had a problem" when he learned of manroland AG's bankruptcy. (R. 50, manroland's Rule 56.1 Resp. ¶ 21; R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 39:22-39:3.) Bonner further testified that he was "very concerned" about manroland's ability to fulfill the Machinery Contract because of the fact that manroland AG was in bankruptcy. (R. manroland's Rule 56.1 Resp. ¶ 22; R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 41:10-14.)

Smith also testified that he became concerned about manroland's ability to perform under the Machinery Contract on November 25, 2011—the date insolvency was announced—and that his concern was not alleviated after Muccari replied to his e-mail and told him he was trying to find out what was going on. (R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 21:20-25:5, 23:2-7.) Smith testified that Koursa was concerned about manroland's ability to deliver and unload the Printing Press by December 31, 2011. (R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 20:21-8.) Smith further testified that Koursa was concerned about how manroland AG's insolvency might impact the installation of the Printing Press and manroland's ability to provide training and

warranty support for the Printing Press. (*Id.*) Karabots testified that he was concerned about the timely shipment of the Printing Press and that creditors of manroland AG might assert claims against the Printing Press. (R. 46, Koursa's Facts, Ex. 1, Sept. 25, 2012 Nicholas Karabots Dep. at 56:13-57-7.) Karabots also testified that manroland AG's bankruptcy made Koursa very uneasy about manroland's ability to perform, and that the delivery time delays that were subsequently submitted caused Koursa further concern. (*Id.* at 168:3:11.)

The following day, Saturday, November 26, 2011, in response to Smith's inquiry, Mugavero advised Smith that "the company [was] re-organizing" and that information would be available early the following week. (R. 50, manroland's Rule 56.1 Resp. ¶ 24; R. 46, Koursa's Facts, Ex. 17.) During this weekend, Koursa made verbal inquiries to manroland seeking information as to how the manroland AG bankruptcy would impact manroland's ability to perform its obligations under the Machinery Contract and the delivery of the Printing Press. (R. 50, manroland's Rule 56.1 Resp. ¶ 25; R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 76:14-77:22; R. 46, Koursa's Facts, Ex. 1, Karabots Dep. at 158:12-19; R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 34:19-35:4.)

That same day, Thomas Hawrysz, the Chief Financial Officer of manroland, (*see* R. 48, Koursa's Rule 56.1 Resp. ¶ 18), sent an e-mail to manroland AG's CFO and its attorney to ask how customer deposits would be treated in light of manroland AG's insolvency and whether there was a possibility of returning those deposits back to the customer in the event the customers demanded the return of funds. (R. 46, Koursa's Facts, Ex. 42, MANR008036-37; R. 46, Koursa's Facts, Ex. 4, Aug. 29, 2012 Tom Hawrysz Dep. at 173:12-18, 174:9-10.)

On Monday, November 28, Smith e-mailed Mugavero and inquired: "What's going on with this . . . I expected to hear from you this morning." (R. 50, manroland's Rule 56.1 Resp. ¶

24; R. 46, Koursa's Facts, Ex. 17, MANR002424.)  Later that morning, Smith e-mailed Karabots and wrote: "Mike Mugavero is telling me that our [Printing P]ress is still on schedule to ship on time and that the factory is continuing with production through this financial reorganization.  I have asked and he has requested confirmation in writing from the factory and expects something from them in the next day or so."  (R. 50, manroland's Rule 56.1 Resp. ¶ 25; R. 46, Koursa's Facts, Ex. 18, KOURSA000520.)

On November 29, 2011, Brown advised Smith that the Printing Press was booked to be transported on the Santa Bettina—a cargo ship estimated to depart Antwerp, Belgium on December 14, 2011, and estimated to arrive in New York on December 22, 2011.  (R. 50, manroland's Rule 56.1 Resp.¶ 26.)  Manroland further advised that the Printing Press would be trucked to Kappa's facility in Pittston, PA and unloading would begin on December 27, 2011.  (R. 50, manroland's Rule 56.1 Resp. ¶ 26.)  The dates in this proposed schedule ("November 29 Schedule") were consistent with the internal manroland schedule Brown had developed between November 1 and 3 and with the scheduling Gantt and rigger estimate Brown had created.

On November 30, 2011, Mugavero e-mailed Kaben that Koursa and Kappa "would like written conformation [sic] that manroland will in fact ship the [Printing Press] and deliver prior to the end of this calendar year."  (R. 46, Koursa's Facts, Ex. 19, MANR002053.)  Kaben responded to Mugavero that day and wrote that to his knowledge, manroland was "not allowed any more to issue any binding conformations[sic]/ agreements without the verification of the insolvency trustee."  (*Id.*)  Kaben further wrote: "The delivery date for Kappa seems very doubtful because several suppliers of parts will not deliver which means regular completion of the machine is currently not possible."  (R. 50, manroland's Rule 56.1 Resp. ¶ 63; R. 46, Koursa's Facts, Ex. 43, MANR002053.)  Kaben also advised that due to its bankruptcy, "[n]o

units are being shipped and logistic services are not available to us."  (R. 50, manroland's Rule 56.1 Resp. ¶ 63; R. 46, Koursa's Facts, Ex. 43, MANR002053.)

On or around December 1, 2011, manroland instituted a reduction in force, during which Brown, the senior project manager for the Printing Press, was laid off.  (R. 50, manroland's Rule 56.1 Resp. ¶ 64.)  That same day, manroland AG advised manroland that manroland AG could not provide any binding confirmations with respect to the shipment date of the Printing Press without the verification of the insolvency trustee.  (R. 50, manroland's Rule 56.1 Resp. ¶ 65; R. 46, Koursa's Facts, Ex. 45, MANR002061.)

On December 2, 2011, Howes advised Kaben, Vince Lapinski[2] and Hawrysz, with respect to the Printing Press:

> If we are not able to delivery [sic] by [December 31, 2011,] the customer has the option to cancel.  If they cancel, we are required to return his money with interest.  As you know the 10% down payment ($317,500), we received, was sent to [manroland AG].  Based on this, we would have no cash to return to them.  They would in all likelihood sue [manroland.]  This action would most likely then cause [manroland] to file for bankruptcy protection.
>
> We have been given dates of the [Printing P]ress on an ocean vessel sailing on December 14th out of Antwerp which would arrive in the states on December 22nd.  The plan was to start to deliver to the customer starting on December 27th.  Based on this schedule we have no room for delay—we must meet the vessel sailing date of December 14th.

(R. 50, manroland's Rule 56.1 Resp. ¶ 66; R. 46, Koursa's Facts, Ex. 46, MANR000244.)

Howes also acknowledged that had manroland not guaranteed the December 31, 2011, delivery date, Koursa would not have purchased the Printing Press from it.  (R. 50, manroland's Rule 56.1 Resp. ¶ 67.)  None of the e-mail recipients advised Howes that his statements were unfounded or erroneous.  (*Id.*)

---

[2] Vince Lapinski was CEO of manroland until February 2012, when he was replaced by Michael Mugavero.  (R. 46, Koursa's Facts, Ex. 4, Hawyrsz Dep.)

On December 2, 2011, at 7:06 a.m., Mugavero wrote to Smith to advise him that he had prepared a written response to Smith's previous inquiries, but that he was "still waiting for legal to approve." (R. 50, manroland's Rule 56.1 Resp. ¶ 27.) Smith recalled that this "set[] off alarm bells left and right" because "if legal has to approve his answer to me, that's a problem." (R. 50, manroland's Rule 56.1 Resp. ¶ 27.)

On December 2, 2011, at 8:01 a.m., Gina Gigliozzi, a Manager of Sales and Service Support for manroland e-mailed Smith a press release ("Press Release") regarding manroland AG's bankruptcy. (R. 50, manroland's Rule 56.1 Resp. ¶ 28, KOURSA001082-83.) The Press Release, under the heading "Mass credit approved for manroland—Continuation of business operations secured" stated that manroland AG had secured a source of financing and would therefore be able to continue production and business operations. (*Id.*) The Press Release further stated: "[t]he financing secures fulfillment of liabilities with customers and suppliers that have placed or received orders with manroland after the company has filed for insolvency. Liabilities originated before the filing will be dealt with as part of the insolvency proceedings later in the process." (*Id.*)

Bonner testified that the Press Release left him "more uncomfortable" because the Machinery Contract was executed before manroland AG filed for bankruptcy. (R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 98:7-99:2; R. 50, manroland's Rule 56.1 Resp. ¶ 30.) Smith testified that the Press Release "just deepened" his concerns because the parties had entered into the Machinery Contract before the insolvency. (R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 39:6-23.)

After receiving the Press Release, Smith sent two e-mails, one on Friday, December 2 ("Smith's December 2 E-mail"), and one on Monday, December 5 ("Smith's December 5 E-

mail"), to manroland employees.  Smith's December 2 E-mail was sent to Gigliozzi, Mugavero, Muccaris, and Bonner, and stated, in relevant part:

> [The Press Release] is somewhat helpful but leaves open the question of how our order will be treated as it was placed before the filing and as noted below "will be dealt with as part of the insolvency proceedings later in the process."  I had previously requested information of when and where our press was to be loaded into containers and released to the shipper.  We may want to have a person on site for that to satisfy the Owner's concern regarding the release of the next payment.
>
> I would like clarification of our questions this morning, please.

(R. 46, Koursa's Facts, Ex. 23, MANR001229.)  On Monday, December 5, Smith again e-mailed Mugavero and inquired about the timing for delivery of the Printing Press.  (R. 50, manroland's Rule 56.1 Resp. ¶ 31.)  Specifically, Smith wrote:

> It is imperative that we hear from MAN Roland today on the circumstances surrounding our shipment and the next payment due.

(R. 46, Koursa's Facts, Ex. 24, KOURSA000106.)

Later that same day, Bonner, on behalf of Koursa, wrote a letter to manroland ("Bonner's Proposal") in which he stated that "[a]s the [Machinery] Contract was executed by the parties and originated before the bankruptcy filing of manroland AG, this is to notice you in writing that Koursa is unwilling to be a party to manroland AG's insolvency proceedings; yet looks to conclude the agreed upon transaction in a proper manner."  (R. 50, manroland's Rule 56.1 Resp. ¶ 32; R. 48, Koursa's Rule 56.1 Resp. ¶ 15; R. 46, Koursa's Facts, Ex. 25, MANR000947.) Bonner proposed a modification to the Machinery Contract:

> We therefore propose a modification to the [Machinery] Contract such that upon receipt of written notice from you that the [Printing Press] is being shipped to Kappa Graphics, LP's plant, Koursa will post a Documentary Letter of Credit in the amount of the Second Payment for the benefit of manroland (the "Letter of Credit").  With such Letter of Credit providing for payment of the Second Payment upon delivery of the [Printing Press] to Kappa Graphics, LP [sic] plant at 50 Rock Street, Pittston, PA, USA.

(R. 46, Koursa's Facts, Ex. 25, MANR000947.)

On December 6, 2011, Howes again e-mailed Kaben asking for an answer to his December 2 E-mail. (R. 46, Koursa's Facts, Ex. 48, MANR002091.) Howes acknowledged that manroland was "past due in getting an answer to [Koursa] on when he will get his [Printing P]ress (we told him that we would have an answer yesterday based on the information that we received from [manroalnd AG]." (*Id.*) Howes also acknowledged that manroland was receiving "heavy pressure" from Koursa. (*Id.*)

Also on December 6, 2011, manroland AG again advised manroland that all deliveries of machines manufactured by manroland AG had stopped. (R. 50, manroland's Rule 56.1 Resp. ¶ 68; R. 46, Koursa's Facts, Ex. 47, MANR002089.) That same day, Lapinski, then-chief executive officer of manroland, advised manroland AG that "[t]o meet the December 31, 2011, delivery date the [Printing P]ress needed to be on an Ocean Vessel by December 14th (sailing out of Antwerp). The vessel would arrive on December 22nd and [be] trucked to the customer starting the 27th of December." (R. 50, manroland's Rule 56.1 Resp. ¶ 69; R. 46, Koursa's Facts, Ex. 49, MANR002943.) In that same e-mail, Lapinski noted that as of that morning, "the [Printing Press] mechanically ha[d] been completed, some of the missing components are the Eltosch IR/UV Dryer, Technotrans beta.C and some electrical parts." (R. 46, Koursa's Facts, Ex. 49, MANR002943.)

Lapinski testified that it took two hours to drive from Newark to Kappa, and manroland estimated that if the Printing Press came in on a certain day, they would have it on a truck the same day and "could even [have] had it [at Kappa] that day or the next day, early in the morning." (R. 50, manroland's Rule 56.1 Resp. ¶ 69, Lapinski Dep. at 135:1-6.)

On December 7, 2011, manroland AG advised manroland that it "could confirm that the Kappa [Printing P]ress is now being packed for shipment in Offenbach and can leave Germany early next week if all goes [according] to plan." (R. 50, manroland's Rule 56.1 Resp. ¶ 70; R. 46; R. 46, Koursa's Facts, Ex. 50, MANR002638.) On December 8, 2011, Jon Surch, who oversaw manroland's project management team, advised manroland's executives, that "[a]t this time I see no chance to make 31st onsite." (R. 46, Koursa's Facts, Ex. 52, MANR002850; R. 46, Koursa's Facts, Sept. 14, 2012 Dep. Jon Surch at 11:19-12:5.) That same day, however, Surch testified that he developed additional information in the form of a commitment from a rigging company that allowed him to believe that manroland could make the December 31, 2011 delivery date. (R. 50, manroland's Rule 56.1 Resp. ¶ 72, Surch Dep. at 98:10-99:14.)

On December 8, 2011, Howes advised Bonner and Smith via an e-mail ("December 8 E-mail) that the Printing Press would ship one week later than it had previously advised. (R. 50, manroland's Rule 56.1 Resp. ¶ 33; R. 46, Koursa's Facts, Ex. 26, MANR006391.) Specifically, the Printing Press was to be booked aboard a vessel named the "Porto," which was estimated to depart Antwerp on December 21, 2011, and estimated to arrive in New York on December 29, 2011. (R. 50, manroland's Rule 56.1 Resp. ¶ 33; R. 48, Koursa's Rule 56.1 Resp. ¶¶ 16, 27.) Contemporaneously, manroland sent Koursa an invoice for the second installment payment of $1,124,930.00. (R. 50, manroland's Rule 56.1 Resp. ¶ 33; R. 48, Koursa's Rule 56.1 Resp. ¶ 16.)

Bonner testified that the December 8 E-mail did not give him any comfort, particularly because the estimated arrival date in New York was December 29, 2011; "it just added to [his] insecurity about [manroland's] ability to perform." (R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 62:9-15.) According to Bonner, this "would not allow enough time" for the Printing Press to

be delivered and unloaded by December 31, 2011. (*Id.* at 62:16-63:4.) Similarly, Smith testified that he interpreted the e-mail to mean that "there was no way that the [Printing P]ress was going to be on our floor by the 31st," in part because of Brown's statement that it would take three to four days to unload the containers. (R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 56:3-17.) Smith further testified that in Koursa's experience, it was not unusual for vessels frequently to arrive later than their estimated shipping date. (R. 50, manroland's Rule 56.1 Resp. ¶ 35; R. 46, Koursa's Facts, Ex. 9, Smith Dep. at 29:21-31:2.) Notably, the Porto, the vessel on which the Printing Press was to be shipped, actually arrived on December 30, 2011. (R. 50, manroland's Rule 56.1 Resp. ¶ 35.) Similarly, the Santa Bettina, on which the Printing Press was originally scheduled to ship also arrived a day later than it was scheduled to arrive. (*Id.*) Karabots testified that the December 8 E-mail "absolutely provided [him] with less comfort and absolute assurance [manroland] could[ not] perform under the [Machinery] Contract." (R. 50, manroland's Rule 56.1 Resp. ¶ 36; R. 46, Koursa's Facts, Ex. 1, Karabots Dep. at 126:9-16.)

The following day, December 9, 2011, Howes e-mailed Bonner and Smith and provided them with a letter signed by the Chairman of the Executive Board of manroland AG and the Provisional Insolvency Administrator for manroland AG confirming that the Printing Press was booked on the Porto and estimated to arrive in New York on December 29, 2011. (R. 48, Koursa's Rule 56.1 Resp. ¶ 17; R. 50, manroland's Rule 56. 1 Resp. ¶ 37; R. 46, Koursa's Facts, Ex. 28, KOURSA000480-81.) In that e-mail, Howes wrote, "I trust that this is sufficient documentation to process the progress payment of $1,124,930 due Prior to shipment ex works." (R. 48, Koursa's Rule 56.1 Resp. ¶ 17; R. 46, Koursa's Facts, Ex. 28, KOURSA000480-81.)

The same day, Lapinski and Hawrysz sent a letter ("manroland's December 9 Letter") responding to Bonner's Proposal and rejecting the proposed modification of the Machinery

Contract.  (R. 50, manroland's Rule 56.1 Resp. ¶ 38; R. 48, Koursa's Rule 56.1 Resp. ¶ 18; R. 46, Koursa's Facts, Ex. 29, KOURSA000471.)  In manroland's December 9 Letter, Lapinski and Hawrysz stated that manroland had provided Koursa with written confirmation from manroland AG that the Printing Press was available to ship and demanded the second payment.  (R. 50, manroland's Rule 56.1 Resp. ¶ 38; R. 48, Koursa's Rule 56.1 Resp. ¶ 18; R. 46, Koursa's Facts, Ex. 29, KOURSA000471.)  Karabots testified that manroland's December 9 Letter did not provide him with any assurance that manroland would perform under the terms of the Machinery Contract.  (R. 46, Koursa's Facts, Ex. 1, Karabots Dep. at 135:9-12.)

Later that same day, Bonner responded to manroland's December 9 Letter ("Bonner's December 9 Letter") and wrote: "The **estimated** shipping date of December 21, 2011 and the **estimated** arrival date in the US of December 29, 2011 (the Friday of the New Years holiday weekend on 12/30 and 12/31) reasonably precludes manroland from fulfilling its obligation under the [Machinery] Contract to deliver the [Printing Press]" to Kappa's plant in Pittston, Pennsylvania, by the December 31, 2011 delivery date.  (R. 50, manroland's Rule 56.1 Resp. ¶ 40; R. 48, Koursa's Rule 56.1 Resp. ¶ 19; R. 46, Koursa's Facts, Ex. 30, MANR000879.)  Bonner also stated that: "Based on manroland's breach of the [Machinery] Contract this letter constitutes [Koursa's] demand for the refund to Koursa by manroland of the $317,500.00 deposit previously paid by Koursa under the [Machinery] Contract."  (R. 48, Koursa's Rule 56.1 Resp. ¶ 19; R. 46, Koursa's Facts, Ex. 30, MANR000879.)  Bonner further stated that although Koursa was "disappointed by manroland's breach of the [Machinery] Contract, Koursa would agree to proceed with the [Machinery] Contract if manroland is able to procure an earlier shipment date for the [Printing Press] from Germany that would result in an arrival in the US no later than December 27, 2011."  (R. 50, manroland's Rule 56.1 Resp. ¶ 41; R. 48, Koursa's Rule 56.1

Resp. ¶ 19; R. 46, Koursa's Facts, Ex. 30, MANR000879.)  Bonner further noted that, because of its concerns, Koursa required that one of its representatives go to Germany to observe loading and shipment of the Printing Press before making an additional payment.  (R. 50, manroland's Rule 56.1 Resp. ¶ 41.)

At his deposition,[3] Hawrysz testified that, to his knowledge, manroland did not provide Koursa with the details of how it would accomplish delivery by December 31, 2011, and it only provided Koursa with the assurances that the Printing Press would be there.  (R. 46, Koursa's Facts, Ex. 4, Hawrysz Dep. at 97:20-98-1, 100:5-8.)  He also testified that the only thing manroland told Bonner was that manroland would "be sure it would get there."  (*Id.* at 113:8-

---

[3]  manroland has submitted the affidavit of Thomas Hawrysz, in which Hawrysz attests to actions that manroland "would have taken" to "ensure timely deliver[y] of the [Printing] Press."  (R. 50, manroland's Rule 56.1 Resp., Affidavit of Thomas Hawrysz ¶¶ 6-7.)  Specifically, Hawrysz attests that "if the [Printing] Press had been loaded onto a ship it would have been loaded onto the ship Porto (the 'Porto') and manroland would have taken steps to confirm the timely deliver[y] of the Press."  (*Id.* ¶ 6.)  Hawrysz then outlines the following steps that manroland "would have taken:"

> a. manroland would have paid extra to make sure that the containers in which the Press would have been stored, if they had been loaded on the Porto, would have receive[d] priority placement so that they were among the very first containers unloaded from the Porto when it docked in New York City.
> . . .
> c. manroland would have arranged for the Press to be "pre-cleared" through customs so that the Press would not be delayed at the Port of New York and New Jersey.
> . . .
> e. manroland would have paid for sufficient trucks to quickly transport the Press.
> f. manroland would have paid for extra riggers, or for riggers to work overtime if necessary, to quickly unload the Press at Kappa's facility.

(R. 50, manroland's Rule 56.1 Resp., Affidavit of Thomas Hawrysz ¶ 7.)  Federal Rule of Civil Procedure 56 requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).  Thus, the Seventh Circuit has held that "statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement."  *Id.*  Hawrysz's statements highlighted above are speculative and conclusory, and the Court therefore disregards them.

11.)  Hawrysz further testified that in January 2012 he had "theoretical" discussions and plans with Howes, but nothing was confirmed in writing.  (*Id.* at 100:11-101:3, 101:22-102:12.)  Hawrysz also testified that manroland did not make any plans, but that it was "aware of compensating action that [it] could take."  (*Id.* at 112:10-17.)  Mugavero testified that he recalled telling Koursa that the Printing Press would be there by December 31, 2011.  (R. 50, manroland's Rule 56.1 Resp. ¶ 42, Mugavero Dep. at 135:14-17.)  John Howes, a manroland employee, testified that the plan for meeting the December 31, 2011 delivery date was "that when [the Printing Press] was off-loaded [manroland] would have . . . gotten a priority loading which [it] could get the [Printing Press] as soon as it was available and get it to [Koursa] and get it off-loaded."  (R. 50, manroland's Rule 56.1 Resp. ¶ 43, Aug. 28, 2012 John Howes Dep. at 170:13-172:5.)

On December 12, 2011, Lapinski and Hawrysz responded to Bonner's December 9 Letter, stating that manroland understood Bonner's concerns, yet insisted on full payment of $1,124,930.00.  (R. 50, manroland's Rule 56.1 Resp. ¶ 45; R. 48, Koursa's Rule 56.1 Resp. ¶ 20; R. 46, Koursa's Facts, Ex. 31, MANR002538.)  Manroland's December 12 Letter advised that manroland intended to deliver the Printing Press no later than December 31, 2011.  (R. 50, manroland's Rule 56.1 Resp. ¶ 45; R. 48, Koursa's Rule 56.1 Resp. ¶ 20.)  Manroland's December 12 Letter further sought confirmation that the additional $801,350.00 would be paid upon delivery of the Printing Press.  (R. 50, manroland's Rule 56.1 Resp. ¶ 45; R. 48, Koursa's Rule 56.1 Resp. ¶ 20.)  In addition, manroland's December 12 Letter advised that manroland required access to Kappa's facility on December 29-31, 2011, in order to complete delivery of the Printing Press.  (R. 50, manroland's Rule 56.1 Resp. ¶ 46; R. 48, Koursa's Rule 56.1 Resp. ¶ 20.)  Bonner testified that manroland's December 12 Letter confirmed Koursa's understanding

that delivery required unloading and placing the Printing Press in Kappa's facility, "not just dropping it on the dock." (R. 50, manroland's Rule 56.1 Resp. ¶46; R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 146:9-147:2.) Bonner further testified that manroland's December 12 Letter did not alleviate Koursa's concern that the Printing Press would be delivered by December 31, 2011, and that manroland's demand for payment added to his insecurity. (R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 145:13-18, 147:3-13.)

On December 13, 2011, Bonner responded to manroland's December 12 Letter and stated that in Brown's November 29 e-mail he reconfirmed the loading and receipt date that manroland had previously committed to and that Koursa had relied upon when executing the Machinery Contract. (R. 46, Koursa's Facts, Ex. 32, MANR001330.) Specifically, Bonner noted that Brown had confirmed that the Printing Press was booked to ship from Antwerp on the Santa Bettina on December 14, 2011 to arrive in the United States on December 22, 2011, and to be delivered to Kappa's plant to begin unloading by December 27, 2011. (*Id.*) Bonner further wrote that in manroland's December 9 Letter, "the **estimated** shipping date ha[d] been unilaterally changed by manroland to December 21, 2011 and the **estimated** arrival date in the US is December 29, 2011." (*Id.*) According to Bonner, the variation in the shipping schedule "when combined with manroland AG's bankruptcy and the stated estimates in [manroland's December 9 Letter], left [Koursa] no choice but to offer the placement of a Letter of Credit or some other form of escrow of funds pending actual delivery of the [Printing Press] at Kappa Graphics facility by December 31, 2011." (*Id.*) In addition, Bonner expressed concern that the bankruptcy of manroland AG created a cloud on clear title on the Printing Press. (R. 50, manroland's Rule 56.1 Resp. ¶ 48; R. 46, Koursa's Facts, Ex. 32, MANR001330.) Bonner also demanded the return of its $317,500.00 deposit that it had previously paid to manroland per the

terms of the Machinery Contract. (R. 48, Koursa's Rule 56.1 Resp. ¶ 21; R. 46, Koursa's Facts, Ex. 32, MANR001330.)

On December 13, 2011, manroland AG confirmed to manroland that the Printing Press "has been completed on the assembly line in the fashion set out by you." (R. 50, manroland's Rule 56.1 Resp. ¶ 73, MANR006424.) On December 21, 2011, however, a manroland employee noted that manroland was "about to complete the missing parts in an extra container." (R. 46, Koursa's Facts, Ex. 54, MANR002151.) Indeed, on January 4, 2012, Howes forwarded an e-mail to Mugavero noting that the Printing Press' missing parts weighed approximately 760 kilograms, and that they would be delivered by air freight. (R. 46, Koursa's Facts, Ex. 55, MANR000280-81.)

On December 14, 2011, Lapinski and Hawrysz responded to Bonner's December 12 Letter and stated that manroland intended to deliver the Printing Press no later than December 31, 2011. (R. 48, Koursa's Rule 56.1 Resp. ¶ 22; R. 50, manroland's Rule 56.1 Resp. ¶ 49; R. 46, Koursa's Facts, Ex. 33, MANR000883.) Manroland further advised, in part:

> However, even if that were not the case, Section 7.15 of the [Machinery] Contract provides that neither party may be "held liable nor deemed in default hereunder for any delay or failure to perform as a result of] . . . work stoppages or slowdowns . . . or governmental intervention." We believe that the business difficulties impacting manroland AG fall under these extraordinary circumstances, which circumstance would explicitly mitigate Koursa's right of termination under Section 7.4 of the [Machinery] Contract in the event that delivery is delayed.

(R. 50, manroland's Rule 56.1 Resp. ¶ 49; R. 46, Koursa's Facts, Ex. 33, MANR000883.)

Manroland's December 14 Letter further stated: "Notwithstanding manroland's intention to perform as promised, following recent discussions and the meeting between our respective representatives this morning . . . we now understand that Koursa will not comply with its upcoming payment obligations under the [Machinery] Contract." (R. 48, Koursa's Rule 56.1

Resp. ¶ 22; R. 46, Koursa's Facts, Ex. 33, MANR000883.)  Therefore, manroland stated that it would not "reasonably proceed with performance under the [Machinery] Contract at this time until it receives assurances from Koursa that your payment will be tendered as previously agreed under the [Machinery] Contract."  (*Id.*)  Karabots testified that manroland's December 14 Letter did not provide him with assurance that manroland would perform under the terms of the Machinery Contract because he thought it was impossible for manroland to deliver the Printing Press by December 31.  (R. 46, Koursa's Facts, Ex. 1, Karabots Dep. at 146:6-146:22.)  Bonner testified that manroland's December 14 Letter did not provide Koursa with assurance that manroland would perform under the terms of the Machinery Contract because it did not specify what manroland would do to guarantee their performance, and manroland's citation to the Machinery Contract's force majeure clause raised a red flag to him.  (R. 46, Koursa's Facts, Ex. 3, Bonner Dep. at 201:5-202:3.)

On December 16, 2011, Mugavero e-mailed Bonner and again demanded payment of $1,124,930.00.  (R. 50, manroland's Rule 56.1 Resp. ¶ 53; R. 46, Koursa's Facts, Ex. 35, MANR003256.)  In response, Karabots advised Lapinski and Hawrysz that manroland's unilateral rescheduling of the shipment date (i.e., from an estimated arrival of December 22, 2011, to an estimated arrival date of December 29, 2011) "certainly clouds your ability to perform on your contractual commitment of having the complete [Printing P]ress, sans sheeter, on our floor by the 31st of December."  (R. 46, Koursa's Facts, Ex. 15, MANR000870; R. 50, manroland's Rule 56.1 Resp. ¶ 54; R. 48, Koursa's Rule 56.1 Resp. ¶ 23.)  Karabots also expressed Koursa's concern that Koursa would be unable to recover monies paid to manroland in the event that manroland was unable to timely delivery the Printing Press.  (R. 50, manroland's Rule 56.1 Resp. ¶ 54.)

Lapinski responded to Karabots' letter by alleging Koursa was in breach of the Machinery Contract. (R. 50, manroland's Rule 56.1 Resp. ¶ 56; R. 48, Koursa's Rule 56.1 Resp. ¶ 24; R. 46, Koursa's Facts, Ex. 36, MANR000915.) In addition, manroland, which had previously rejected Koursa's proposed letter of credit, now proposed that Koursa post a letter of credit conditioned only on delivery of the Printing Press to the Kappa facility. (R. 50, manroland's Rule 56.1 Resp. ¶ 56.) Manroland's response did not address Koursa's concern that Koursa would be unable to recover monies paid to manroland in the event that manroland was unable to timely delivery the Printing Press. (R. 46, Koursa's Facts, Ex. 36, MANR000915.) In response, Bonner advised Lapinski that manroland's proposal was flawed because it did not condition the letter of credit on delivery of the Printing Press to the Kappa facility by December 31, 2011, as required by the Machinery Contract. (R. 50, manroland's Rule 56.1 Resp. ¶ 57; R. 46, Koursa's Facts, Ex. 37, MANR002627.) On December 22, 2011, Lapinski sent Koursa and other customers a letter advising that, as a result of manroland AG's insolvency, manroland had to change its "standard Net 30 day payment terms for parts and service to Net 10 days." (R. 50, manroland's Rule 56.1 Resp. ¶ 58; R. 46, Koursa's Facts, Ex. 38, MANR002632.)

The Printing Press never shipped. (R. 50, manroland's Rule 56.1 Resp. ¶ 18.) Koursa never paid manroland for the second part of the Machinery Contract. (R. 50, manroland's Rule 56.1 Resp., Hawrysz Aff. ¶ 5.) On December 21, 2011, manroland confirmed that the shipment of the Printing Press was stopped at the harbor. (R. 46, Koursa's Facts, Ex. 54, MANR002151.)

## PROCEDURAL HISTORY

Koursa initiated this action on February 2, 2012, by filing a two-count complaint alleging claims for anticipatory breach of contract and repudiation of contract. (R. 1, Compl. at 6-7.) The day prior to the filing of the instant action, manroland filed an action in the Circuit Court of the Eighteenth Judicial Circuit of the State of Illinois alleging breach of contract and anticipatory repudiation ("manroland State Action"). (R. 9-2, Jt. Mot., Ex. B., manroland Compl. at 2-10.) On February 3, 2012, Koursa removed the manroland State Action to the District Court for the Northern District of Illinois. (R. 9, Jt. Mot. at 2; *manroland v. Koursa*, No. 2012 L 00781, ECF No. 1, Not. Removal.) Thereafter, on February 22, 2012, the parties filed a joint motion to reassign and consolidate the now-removed manroland State Action with the instant action and to stay the action for 45 days while the parties engaged in settlement negotiations. (R. 9, Jt. Mot. at 1.) On February 29, 2012, the Court granted the joint motion and stayed the action. (R. 12, Min. Entry.) After settlement discussions were unsuccessful, the Court directed the parties to proceed with all discovery. (R. 20, Min. Entry.)

On June 29, 2012, manroland answered Koursa's complaint and filed a counterclaim reiterating its breach of contract and anticipatory repudiation claims from the now-removed manroland State Action. (R. 25, manroland's Answer & Countercl.) On July 17, 2012, Koursa filed an answer and affirmative defenses to manroland's counterclaim. (R. 28, Koursa's Answer.) Discovery closed on September 27, 2012. (R. 31, Min. Entry.)

On October 5, 2012, manroland moved for summary judgment in its favor. (R. 37, manroland's Mot.) Manroland argues that the Court should enter summary judgment in its favor on Counts I and II of Koursa's complaint, for anticipatory breach of contract and repudiation of contract, respectively, and on Counts I and II of manroland's counterclaim, for breach of

contract and anticipatory repudiation, respectively. (R. 38, manroland's Mem. at 8-14.) Manroland contends that Koursa anticipatorily breached the Machinery Contract by failing to make a second payment after manroland provided it with affirmations that the Printing Press would be delivered by December 31. (*Id.* at 8-9.) Manroland further argues that Koursa never sought adequate assurance of performance from manroland, and that even if it did, manroland provided adequate assurance. (*Id.* at 9-14.) Finally, manroland argues that the Court should enter summary judgment in its favor in the amount specified in the Machinery Contract. (*Id.* at 14-15.)

On November 19, 2012, Koursa filed its opposition to manroland's motion for summary judgment, (R. 47, Koursa's Opp.), responses and objections to manroland's statement of facts, (R. 48, Koursa's Rule 56.1 Resp.), and a statement of additional material facts requiring the denial of manroland's motion, (R. 52, Koursa's Add'l Facts). Koursa argues that summary judgment should not be entered in manroland's favor because, according to Koursa, Koursa did not anticipatorily breach the Machinery Contract, manroland failed to provide adequate assurance, and manroland anticipatorily breached the Machinery Contract prior to the second payment's due date. (R. 47, Koursa's Opp. at 2-13.) Koursa also argues that manroland is not entitled to summary judgment in the amount specified in the Machinery Contract because Koursa neither breached nor repudiated the Machinery Contract. (*Id.* at 14-16.)

Koursa filed its own motion for summary judgment on October 22, 2012. (R. 44, Koursa's Mot.) Koursa argues that it is entitled to judgment in its favor because manroland anticipatorily breached the contract by failing to ensure timely shipment of the Printing Press and repudiated the contract by failing to provide adequate assurance after Koursa became insecure about manroland's ability to perform under the Machinery Contract. (*Id.* at 3-14.) On

November 19, 2012, manroland filed a response to Koursa's motion for summary judgment, (R. 49, manroland's Resp.), a response to Koursa's statement of material facts, (R. 50, manroland's Rule 56.1 Resp.), and a statement of additional facts in support of its response to Koursa's motion, (R. 51, manroland's Add'l Facts). Manroland argues that Koursa's motion should be denied because it was Koursa, and not manroland, that anticipatorily repudiated the Machinery Contract. (R. 49, manroland's Resp. at 5-7.) Manroland further argues that Koursa never sought adequate assurance, and that even if it did, manroland provided such assurance. (*Id.* at 8-15.)

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has said that summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c) (1987)). In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of this Court in ruling on a motion for summary judgment to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Omnicare Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record.")

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *See Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *see also Celotex Corp.*, 477 U.S. at 322. The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco*

*Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993) (citing *Celotex*, 477 U.S. at 325);

*Wheeler*, 539 F.3d 634 ("The moving party bears the initial burden of demonstrating that these

requirements have been met; it may discharge this responsibility by showing 'that there is an

absence of evidence to support the non-moving party's case.'") (citing *Celotex*, 477 U.S. at 323).

Once the moving party has met this burden, the non-moving party must "set forth specific facts

showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting Fed.

R. Civ. P. 56(e) (1987)); *Wheeler*, 539 F.3d at 634 ("To overcome a motion for summary

judgment, the non-moving party must come forward with specific facts demonstrating that there

is a genuine issue for trial." (citing *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986)).  The non-moving party may not rely on mere conclusions or allegations to

create a genuinely disputed issue of material fact.  *See Balderston v. Fairbanks Morse Engine

Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 247-48).

Nor can mere speculation "be used to manufacture a genuine issue of fact." *Springer v.

Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks omitted) (quoting

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).  In order to defeat a motion for

summary judgment, the nonmoving party "must make a showing sufficient to establish any

essential element of [his] cause of action for which [he] will bear the burden of persuasion at

trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997) (citing *Celotex Corp.*,

477 U.S. at 322).  "The existence of a mere scintilla of evidence, however, is insufficient to

fulfill this requirement.  The nonmoving party must show that there is evidence upon which a

jury reasonably could find for [him]." *Wheeler*, 539 F.3d at 634 (internal citation omitted).  On

cross-motions for summary judgment, each movant must satisfy the requirements of Federal

Rule of Civil Procedure 56. *See Cont'l Cas. Co. v. NW Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

ANALYSIS

## I.      Jurisdiction and applicable law

Neither party disputes federal subject matter jurisdiction, (R. 48, Koursa's Rule 56.1 Resp. ¶ 1; R. 50, manroland's Rule 56.1 Resp. ¶ 3), but this Court must consider the issue on its own initiative. *Fid. & Deposit Co. of Md. v. City of Sheboygan Falls*, 713 F.2d 1261, 1264-65 (7th Cir. 1983). Koursa avers that this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, (R. 1, Compl. ¶ 7), which requires diversity of citizenship and that the amount in controversy exceed the statutory requirement of $75,000. 28 U.S.C. § 1332. The parties must be completely diverse, *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), and they are: Koursa is a Pennsylvania corporation with its principal place of business in Pennsylvania. (R. 46, Koursa's Facts ¶ 1.) Manroland is a Delaware corporation with its principal place of business located in Illinois. (*Id.* ¶ 2.) Koursa seeks to recover its $317,000 down payment plus expenses, which meets the statutory requirement. Thus, the Court concludes that it has subject matter jurisdiction based on diversity of citizenship.

In federal cases based on diversity jurisdiction, federal courts apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). The law governing choice of law is substantive law, *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941), and thus the Court applies Illinois law governing choice of law. The Machinery Contract stipulates that it "shall be governed by and construed in accordance with the laws of the State of Illinois." (R. 1-1, Machinery Contract at 25.) "So long as a choice of law provision does not contravene Illinois public policy and there is some relationship between the chosen forum and the parties to the

transaction, an express choice of law provision will be given full effect." *Freeman v. Williamson*, 890 N.E.2d 1127, 1133 (Ill. App. Ct. 1st Dist. 2008). Here, neither party contests the choice of law provision. Therefore, the Court gives full effect to the choice of law provision in the Machinery Contract and applies Illinois State law to this dispute.

Furthermore, the Court determines that the Uniform Commercial Code ("UCC"), as adopted by Illinois, applies to the Machinery Contract. Article 2 of the UCC applies to transactions in goods. 2A Daniel R. Murray & Carter H. Klein, Illinois Practice Series, UCC with Illinois Code Comments, § 5/2-102 cmt. 4 (West 2013). The UCC defines goods to mean "all things, including specifically manufactured goods, which are movable at the time of identification to the contract for sale." 810 Ill. Comp. Stat. 5/2-105(1). The Printing Press that lies at the heart of this dispute clearly falls within the UCC's definition of a good. *Burrus v. Itek Corp.*, 360 N.E.2d 1168, 1170 (Ill. App. Ct. 3d Dist. 1977) (concluding that a movable printing press falls within the UCC's definition of a good). Where a contract involves both a sale of goods and services—as the Machinery Contract at issue here—it is a "mixed" transaction, and Illinois courts apply the "dominant purpose" test to determine whether Article 2 applies. *Id.* Under the dominant purpose test, "if the contract is predominantly for the sale of goods, with services being incidental thereto, the contract will be governed by article 2. Conversely, if the contract is predominantly for services, with the sale of goods being incidental thereto, the contract will not fall within article 2." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 195 (Ill. 2002). Through the Machinery Contract, manroland agreed to sell to Koursa a Printing Press and also agreed to provide 300 hours of training, limited warranty support for an additional year, and certain price concessions for parts for a 24-month period. Accordingly, the Machinery Contract predominantly concerned the sale of the Printing Press

with additional services such as training and warranty support being incidental thereto. (R. 1-1, Machinery Contract.) Thus, the Court concludes that Article 2 of the UCC governs the Machinery Contract.

## II.     Koursa's motion for summary judgment

In its complaint, Koursa asserts two counts: anticipatory breach of contract by manroland (Count I) and repudiation of the Machinery Contract by manroland (Count II). (R. 1, Compl. at 6-7.) In its motion for summary judgment, Koursa argues that the Court should enter summary judgment on its complaint in its favor because manroland anticipatorily breached and repudiated the Machinery Contract. (R. 45, Koursa's Mem. at 3-14.) Therefore, Koursa argues that it was entitled to withhold the second payment and is also entitled to damages. (*Id.*)

### A.     Whether manroland anticipatorily breached the Machinery Contract

Under Illinois law, a party commits an anticipatory breach of contract when it manifests "a definite and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed for it in the contract arrives." *First Nat'l Bank & Trust Co. of Evanston v. First Nat'l Bank of Skokie*, 533 N.E.2d 8, 12 (Ill. App. Ct. 1st Dist. 1988) (quoting *Stonecipher v. Pillatsch*, 332 N.E.2d 151, 153 (Ill. App. Ct. 2nd Dist. 1975)). "A definite statement to the promissee that the promissor will not or cannot perform the contract will operate as an anticipatory breach." *Id.* Koursa argues that manroland's actions constituted an anticipatory breach of the Machinery Contract because they demonstrated that manroland was not capable of performing on its delivery obligations. (R. 45, Koursa's Mem. at 5.) First, Koursa has failed to point to any unequivocal statements by manroland that it would not perform under the Machinery Contract. Instead, the record evidence establishes that manroland continued to insist—perhaps naively—that it would meet the December 31, 2011 delivery deadline. Second, there is a genuine issue of material fact as to whether delivery included only

the delivery of the eight cargo containers to Kappa's facility, or whether it included the delivery, unloading, and installation of the Printing Press.  If delivery was of the former sort, then the record does not support Koursa's argument that manroland would have missed the December 31, 2011 deadline.  Indeed, various manroland employees testified that Kappa's facility was a mere two hours from the port in New York, so if the Printing Press arrived on the Porto in New York on December 29, 2011, it seems likely that manroland would have met the December 31, 2011 deadline.  If delivery encompassed the unloading of the cargo containers, however, then it seems that manroland would almost certainly not have met the December 31, 2011 deadline.  Thus, the Court denies summary judgment as to Koursa on this Count.

## B. Whether manroland repudiated the Machinery Contract

Koursa next argues that manroland repudiated the Machinery Contract because it failed to provide adequate assurance to Koursa pursuant to UCC Section 2-609. (*Id.* at 7-14.) Sections 2-609 through 2-611 of the UCC govern the right to adequate assurance of performance, anticipatory repudiation, and retraction of anticipatory repudiation. 810 Ill. Comp. Stat. 5/2-609-611. UCC Section 2-609 provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." 810 Ill. Comp. Stat. 5/2-609. In other words, under UCC Section 2-609, a "party to a contract can demand assurances from the other when it feels insecure about the prospects for performance." *Enron Power Mktg., Inc. v. Nevada Power Co.*, No. 01–16034 (AJG), 03 Civ. 9318(BSJ), 03 Civ. 9332(BSJ), 2004 WL 2290486, at *2 (S.D.N.Y. Oct. 12, 2004) (interpreting UCC § 2-609); 2A Daniel R. Murray, Carter H. Klein, Illinois Practice Series, UCC with Illinois Code Comments, § 5/2-609 cmt. 3 (West 2013) ("This section applies when one party suspects the other is about to break the contract when the latter's performance becomes due."). "This mechanism is a UCC innovation designed to solve the problem of anticipatory breach." *Enron Power Mktg., Inc. v. Nevada Power Co.*, 2004 WL 2290486, at *2. Thus, "[i]nstead of breaching a contract when one party fears the other will not perform, the first party can demand assurances from the second." *Id*. The failure to respond to a demand for adequate assurance within 30 days constitutes repudiation of the contract. 810 Ill. Comp. Stat. 5/2-609(4). Where a party fails to provide adequate assurance of performance, UCC Section 2-610(b) permits the other party to suspend performance pursuant to UCC Section 2-711. *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167,

1170 (7th Cir. 1976). Specifically, UCC Section 2-610 governs anticipatory repudiation and provides that:

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>
> (a) for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach (Section 2-703 or Section 2-711) . . . ; and
>
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2-704).

810 Ill. Comp. Stat. 5/2-610. As relevant here, Section 2-711 provides that where the seller repudiates, the buyer may cancel and may seek damages. 810 Ill. Comp. Stat. 5/2-711.

Accordingly, to prevail on its motion, Koursa must show that it demanded assurance that manroland would comply with the Machinery Contract and that manroland failed to provide adequate assurance such that Koursa was entitled to the remedies set forth in UCC Section 2-610(b)—suspension of performance and entitlement to damages. Specifically, Koursa must show that there is no dispute of material fact that (a) it had reasonable grounds for insecurity regarding manroland's performance; (b) it demanded in writing adequate assurance of due performance; and (c) manroland failed to provide adequate assurance.

Under UCC Section 2-609, what constitutes reasonable grounds for insecurity and adequate assurance, as between merchants, is determined according to commercial standards. 810 Ill. Comp. Stat. 5/2-609(2). The UCC defines a "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." 810 Ill. Comp. Stat. 5/2-104. Here, manroland is the sales arm of manroland AG, a manufacturer of printing presses, and

therefore it is an organization that deals in goods of the kind sold under the Machinery Contract. *See Burrus*, 360 N.E.2d at 1170 ("It is obvious that the defendant is a merchant since its business is to sell printing presses."). Koursa is in the business of leasing printing equipment to third parties, and thus by its occupation holds itself out as having knowledge of the Printing Press that was the subject of the Machinery Contract. Therefore, both manroland and Koursa were merchants, and the reasonableness and adequacy of the insecurities and assurances is determined according to commercial standards. 810 Ill. Comp. Stat. 5/2-609(2). Importantly, what constitutes reasonable commercial standards is a question that requires factual determination. *JPMorgan Chase Bank, N.A. v. Mal Corp.*, No. 07 C 2034, 2009 WL 804049, at *4 (N.D. Ill. Mar. 26, 2009) (requiring a factual determination of what reasonable commercial standards prescribe); *see also In re Ostrom-Martin, Inc.*, 202 B.R. 267, 276 (Bankr. C.D. Ill. 1996) (concluding that testimony was needed to establish what constitutes reasonable commercial standards).

### 1. Whether Koursa had reasonable grounds for insecurity

Koursa argues that it had reasonable grounds for insecurity. (R. 45, Koursa's Mem. at 8-11.) While the existence of a party's reasonable grounds for insecurity is generally a question of fact, *AMF, Inc.*, 536 F.2d at 1170, courts can decide the issue as a matter of law, based upon the record evidence, *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 703-04 (2d Cir. 1993) (holding as a matter of law that reasonable grounds of insecurity did not exist under New York UCC Section 2-609); *Hitachi Zosen Clearing, Inc. v. Liberty Mut. Ins. Co.*, No. 92 C 5363, 1996 WL 388432, at *6 (N.D. Ill. July 8, 1996) (concluding on the basis of the record on summary judgment that it was reasonable for the plaintiff to have grounds for insecurity with respect to the defendant's performance under the contract). To find a reasonable ground of insecurity, "there

must be an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform." *Puget Sound Energy, Inc. v. Pac. Gas & Elec. Co.* (*In re Pac. Gas & Elec. Co.*), 271 B.R. 626, 640 (N.D. Cal. 2002). "The UCC allows a broad definition of the circumstances that could give rise to a party's insecurity." *Enron Power Mktg., Inc.*, 2004 WL 2290486, at *3 (citing UCC § 2-609, Official Comment (4)). Insolvency of the other party may constitute reasonable grounds for insecurity when the circumstances surrounding the insolvency suggest that it will impair the insolvent party's ability to perform. *See id.*; *see also Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 191 (5th Cir. 1984) (holding that a company had reasonable grounds for insecurity where it received information from a reliable source that the customer was no longer making mortgage payments but rather another company was); *but see In re Beeche Sys. Corp.*, 164 B.R. 12, 16-17 (N.D.N.Y. 1994) (rejecting construction company's reasonable insecurity claim where supplier filed for bankruptcy shortly after the contract was executed and failed to disclose the existence of the bankruptcy because the supplier had performed all of its contractual obligations after the filing).

Here, the Court concludes that manroland AG's insolvency and the implications the insolvency had on manroland's ability to deliver the Printing Press by December 31, 2011, gave Koursa reasonable objective grounds for insecurity. First, manroland AG was the manufacturer of the Printing Press and, therefore, manroland's ability to deliver the Printing Press by the December 31, 2011 deadline depended on manroland AG's ability to finish manufacturing the Printing Press. Second, after manroland AG's bankruptcy, manroland postponed the delivery schedule for the Printing Press. On November 29, 2011, manroland advised Koursa that it planned to ship the Printing Press on the Santa Bettina, which was estimated to arrive in New York on December 22, 2011; the Printing Press would then arrive at Kappa's facility on

December 27, 2011, at which point the four-day process of unloading the Printing Press would begin.  On December 8, 2011, however, manroland notified Koursa that the Printing Press would ship seven days later aboard the Porto, which was estimated to arrive in New York on December 29, 2011.  The revised shipment schedule suggested that manroland's ability to meet the December 31, 2011 delivery deadline could be jeopardized.  *See AMF, Inc.*, 536 F.2d at 1170 (where seller continued to push back delivery projections, buyer had reasonable grounds for insecurity).  Third, manroland AG's Press Release regarding the bankruptcy unequivocally stated that "[l]iabilities originated before the filing will be dealt with as part of the insolvency proceedings later in the process."  (R. 46, Koursa's Facts, Ex. 23, MANR001230; R. 50, manroland's Rule 56.1 Resp. ¶ 28, KOURSA001082-83.)  The Machinery Contract was such a liability because it was executed prior to the filing date on which manroland AG filed for bankruptcy, and it required performance by manroland AG.  This further suggested that the manufacture and shipment of the Printing Press could be delayed, rendering manroland's compliance with the already-tight delivery schedule impossible.  The Court concludes that all of these reasons gave Koursa reasonable grounds to demand assurance.

Seeking to avoid this result, manroland argues in a footnote that "[w]hile a *buyer's* insolvency may present a legitimate risk of non-performance . . . the same risk does not exist in relation to a seller who is obligated to deliver a custom-made good."  (R. 38, manroland's Mem. at 9 n.7) (citing *Brassel v. Troxel*, 68 Ill. App. 131, 133-34 (Ill. App. Ct. 2d Dist. 1896)).  In support of this argument, manroland cites to a 1896 case from an Illinois appellate court that reasoned: "A party may protect himself against the insolvency of the other party[4] by taking

<hr/>

[4] manroland quotes this phrases as follows: "A party may protect himself against the insolvency of the **[buyer]** by taking security for its performance on his part . . . ." (R. 38, manroland's Mem. at 9 n.7) (brackets in original; emphasis added.)  Manroland's version of the quotation is misleading.

security for its performance on his part, but the contract does not lack mutuality because one of the parties might be unable to pay damages for failure to perform on his part." *Brassel*, 68 Ill. App. at 133-34. *Brassel* is inapplicable. First, *Brassel* addressed the question of whether a contract lacked mutuality because one party was insolvent and unable to pay damages in the event of breach, *id.*; it did not address the question of what constitutes reasonable grounds for insecurity under UCC Section 2-609. Second, manroland's misleading quotation notwithstanding, *Brassel* did not single out the seller as being uniquely entitled to protect itself from the insolvency of the other party; indeed, the Illinois appellate court explicitly referred to the "insolvency of one or both parties." *Id*.

Manroland next argues that insolvency risk does not exist in the case of an insolvent manufacturer because "an insolvent seller would be more likely to tender goods in exchange for needed cash." (R. 38, manroland's Mem. at 9 n.7.) This argument ignores the fact that an insolvent manufacturer, though it may earnestly desire to tender goods in exchange for cash, might simply be unable to perform. A manufacturer requires cash in order to pay its workers and suppliers, and it is likely that insolvency would hinder its ability to do so. In fact, the record shows that after its bankruptcy filing, manroland AG had difficulties obtaining parts and funding to complete some of its presses: Kaben noted that "several suppliers of parts will not deliver which means regular completion of the machine is currently not possible." (R. 46, Koursa's Facts, Ex. 43, MANR002053.) Therefore, the Court rejects manroland's arguments that Koursa did not have reasonable grounds for insecurity.

### 2. Whether Koursa demanded in writing adequate assurance

Koursa next argues that it demanded in writing adequate assurance of due performance. (R. 45, Koursa's Mem. at 8-11.) "Although a number of cases . . . waive the requirement [that a

demand for assurance be in writing] when the party on whom the demand is made knows that it has been made, . . . the most recent Illinois cases insist on strict compliance" with the requirement that the demand for assurance be made in writing. *Chronister Oil Co. v. Unocal Refining and Mktg.*, 34 F.3d 462, 464 (7th Cir. 1994) (internal citations omitted); *contra AMF*, 536 F.2d at 1170-71 (noting that Seventh Circuit had previously rejected "a formalistic approach" and waiving the writing requirement where the party on whom a demand for assurance was made knew that it had been made). Thus, while Mugavero's November 30 e-mail to Kaben, in which he states that "[Koursa] would like written confirmation that manroland will in fact ship the [Printing Press] and deliver prior to the end of this calendar year," (R. 46, Koursa's Facts, Ex. 19, MANR002053), indicates that manroland knew that Koursa had made a demand for assurance, Koursa must nevertheless show its own written demand for assurance in order to meet the now-strictly interpreted writing requirement under UCC Section 2-609(1).

To invoke UCC Section 2-609, a party's written communication must "mention 2-609 of the code or demand assurances." *Canteen Corp. v. Former Foods, Inc.*, 606 N.E.2d 174, 184 (Ill. App. Ct. 1st Dist. 1992). The demand for assurances must be "a clear demand so that all parties are aware that, absent assurances, the demanding party will withhold performance." *Puget Sound Energy, Inc.*, 271 B.R. at 642. The demand for assurances can only be a demand for that to which a party is already entitled to under the contract. *See Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 581 (7th Cir. 1976) ("We do not construe [Section] 2-609 as being a vehicle . . . for an implied term being inserted in a contract when a substantially equivalent term was expressly waived."). Further, a mere notice of cancellation "cannot reasonably be interpreted as a demand for assurances." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 686 F. Supp. 1319, 1350 (N.D. Ill. 1988).

In its motion, Koursa points to Smith's December 2 e-mail and Bonner's Proposal and argues that these e-mails "plainly communicated [its grounds for insecurity] to manroland." (R. 45, Pl.'s Mem. at 9-11). Simply communicating insecurities, as Smith did in his December 2 E-mail, is not sufficient to invoke UCC Section 2-609. Smith's December 2 E-mail is not a clear demand indicating that absent assurances Koursa would withhold performance. *See, e.g.*, *Puget Sound Energy, Inc.*, 271 B.R. at 642 (finding that a letter that "did not include any statement regarding the consequences of a failure to respond" did not qualify as a written demand for assurances under UCC Section 2-609).

Bonner's Proposal, however, is sufficiently clear that absent assurances, Koursa would withhold performance. Bonner's Proposal states that although Koursa is not willing to be a party to manroland AG's insolvency proceedings, it is nevertheless looking "to conclude the agreed upon transaction in a proper manner." (R. 46, Koursa's Facts, Ex. 25, MANR000947.) To that end, Bonner

> propose[d] a modification to the [Machinery] Contract such that upon receipt of written notice from [manroland] that the [Printing Press] is being shipped to Kappa Graphics, LP's plant, Koursa will post a Documentary Letter of Credit in the amount of the Second Payment for the benefit of manroland (the "Letter of Credit"). With such Letter of Credit providing for payment of the Second Payment upon delivery of the [Printing Press] to Kappa Graphics, LP [sic] plant at 50 Rock Street, Pittston, PA, USA.

(*Id.*) The first sentence of Bonner's Proposal (that "Koursa is unwilling to be a party to manroland AG's insolvency proceedings") clearly indicates that Koursa was not willing to proceed with performance without first receiving proper assurances. Further, Koursa's indication that it still "look[ed] to conclude the agreed upon transaction in a proper manner," makes it clear that Bonner's Proposal was not a mere notice of termination or cancellation. Finally, Bonner's proposal that Koursa furnish payment with a conditional letter of credit is an

43

example of the type of assurance that Koursa would have found acceptable. Thus, Bonner's Proposal appears to have all the necessary ingredients to be a proper demand for assurance in writing.

As manroland points out, however, Bonner's Proposal could easily be construed as a proposal for a modification to the contract, rather than a proper demand for adequate assurance. (R. 49, manroland's Resp. at 10.) In support of its argument, manroland cites the principle that "[a] request to modify a contract is not a proper demand for adequate assurance." (*Id*. at 8) (citing 2A Daniel R. Murray, Carter H. Klein & Donald R. Cassling, Illinois Practice Series, UCC with Illinois Code Comments, § 5/2-609 (2012 ed.)). Manroland's contention is that Koursa's proposal to pay with a conditional letter of credit is a modification that adds an additional payment term into the Machinery Contract rather than a proper demand for adequate assurance under UCC Section 2-609. (*Id*. at 8-10.) Bonner's Proposal itself states that Koursa is "propos[ing] a modification to the Contract." (R. 46, Koursa's Facts, Ex. 25.) In form, therefore, Bonner's Proposal appears to be a proposal for a contract modification, and thus, on its face, it appears invalid as a written demand for assurance under UCC Section 2-609.

On the other hand, in cases involving an insolvent party, the shifting of credit terms might be necessary under some circumstances to constitute an acceptable demand for assurance. *See, e.g., SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 927 (N.D. Ill. 2007) ("[Plaintiff] has given assurances of future payments by offering to provide letters of credit or depositing the full amount of payment with this Court, or other third party, at the time orders are placed."); s*ee also* Murray, Klein and Cassling, Illinois Practice Series, UCC With Illinois Code Comments, § 5/2-609 cmt. 4 (West 2013) ("The aggrieved party is entitled to demand only adequate assurance of due performance . . . shifting from credit to cash terms should constitute, and might be

necessary, under some circumstances, to constitute 'adequate' assurance.")  Thus, a shift of payment terms can therefore constitute a proper demand for assurance.  Here, Koursa proposed to shift the terms of payment from cash to credit with payment conditional on manroland's performance.  (R. 46, Koursa's Facts, Ex. 25, MANR000947.)  A buyer demanding a shift from cash to credit payment to pay an insolvent seller is analogous to a seller demanding a shift from credit to cash payment from an insolvent buyer—in both cases, the shift protects the demanding party from the other party's insolvency.  Therefore, in substance, Bonner's Proposal makes demands that are consistent with other valid UCC Section 2-609 demands for assurance and appears to be a valid demand for assurance.

Because Bonner's Proposal appears, in form, to be a proposed modification, but also appears, in substance, to be a valid demand for assurance, the Court concludes that there is an unresolved issue of material fact regarding whether Koursa made a demand for adequate assurance of due performance.  Furthermore, what constitutes an adequate demand for assurance under UCC Section 2-609 is determined according to commercial standards, 810 Ill. Comp. Stat. 5/2-609(2), which typically involves a factual inquiry.  *JPMorgan Chase Bank, N.A*, 2009 WL 804049 at *4.  Because the Court lacks record evidence of commercial standards regarding the shifting of payment terms, the Court cannot grant Koursa's motion for summary judgment on its repudiation claim, Count II.

### III. manroland's motion for summary judgment

In its motion for summary judgment, manroland asserts that summary judgment should be entered for it on Counts I and II of Koursa's complaint for anticipatory breach of contract and repudiation of contract, respectively, and on Counts I and II of manroland's counterclaim for breach of contract and anticipatory repudiation, respectively. (R. 38, manroland's Mem. at 8-14.) The Court addresses each argument in turn.

#### A. Whether manroland anticipatorily breached the Machinery Contract

Again, under Illinois law, a party commits an anticipatory breach of contract when there is "a definite and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed for it in the contract arrives." *First Nat'l Bank & Trust Co. of Evanston*, 533 N.E.2d at 12 (Ill. App. Ct. 1st Dist. 1988) (quoting *Stonecipher*, 332 N.E.2d at 153). As discussed above in Section II.A., *supra*, there is a genuine issue of fact as to what delivery of the Printing Press encompassed. If delivery did not encompass the unloading of the cargo containers, then manroland likely would not have been in breach of the Machinery Contract. If delivery encompassed unloading, then manroland's actions in delaying the shipment of the Printing Press very likely could constitute a manifestation of manroland's intention to miss the December 31, 2011 delivery deadline. Accordingly, the Court finds that genuine issues of material fact preclude the entry of summary judgment in favor of manroland on Koursa's claim for anticipatory breach of contract.

#### B. Whether manroland repudiated the Machinery Contract

manroland argues that summary judgment should be entered in its favor on Koursa's claim for repudiation of contract because even if Koursa is found to have sought adequate assurances of performance, manroland provided adequate assurances, (R. 38, manroland's Mem.

46

at 9, 12-13). This inquiry necessarily turns on whether Bonner's Proposal is considered a demand for adequate assurance under the UCC. Since the Court is unable to determine as a matter of the law whether Koursa requested adequate assurance, the Court is unable to determine whether manroland provided the assurance requested. Furthermore, if Bonner's Proposal is such a demand, then the evidence in the record demonstrates that manroland did not, in fact, provide Koursa with a letter of credit. Thus, there is a genuine dispute of material fact, and the Court therefore declines to grant summary judgment in favor of manroland on Koursa's claim for repudiation of contract.

### C. Whether Koursa anticipatorily repudiated the Machinery Contract or breached the Contract

manroland also argues that Koursa anticipatorily repudiated the Machinery Contract. (R. 38, manroland's Mem. at 8.) "Under Illinois law, a party commits an anticipatory repudiation when it manifests a clear, unequivocal intent not to perform under the contract when performance is due." *Arlington LF, LLC v. Arlington Hospitality, Inc.*, 637 F.3d 706, 713 (7th Cir. 2011) (citations omitted). Upon one party's anticipatory repudiation, "the other party may treat the contract as ended." *Id.* (internal citations omitted). Furthermore, "whether an anticipatory repudiation has occurred is a question of fact." *Id.* Relying on UCC Section 2-703, manroland argues that "if a buyer fails to make a payment due or repudiates, then the seller may withhold delivery of goods, cancel the contract, and seek damages." (R. 38, manroland's Mem. at 9.) According to manroland, as of December 16, when Koursa made it clear to manroland that it would not make the second payment, manroland had not breached any of its obligations under the Machinery Contract. (*Id.*) Manroland asserts that therefore, Koursa's refusal was without justification and accordingly, manroland was entitled to suspend its performance. (*Id.*)

Contrary to manroland's misleading quotation, UCC Section 2-703 actually states: "Where the buyer *wrongfully* . . . fails to make a payment due on or before delivery or repudiates with respect to a part or the whole . . . then . . . the aggrieved seller may," among other things, withhold delivery of such goods, stop delivery, recover damages, or cancel. 810 Ill. Comp. Stat. 5/2-703 (emphasis added). As discussed in Section II.B.2., *supra*, there is a genuine dispute of material fact as to whether Koursa made a demand for adequate assurance of performance through Bonner's Proposal. If Bonner's Proposal constitutes a demand for adequate assurance, then Koursa could not have "wrongfully" failed to make the second payment when it was due as it was entitled to suspend performance while it awaited manroland's assurance. 810 Ill. Comp. Stat. 5/2-609(1) (noting that a party who has made a written demand for adequate assurance may, until he received such assurance, "suspend any performance for which he has not already received the agreed return"). Accordingly, the Court declines to grant summary judgment to manroland on its anticipatory repudiation counterclaim. For the same reasons, the Court also declines to enter summary judgment in favor of manroland on its counterclaim for breach of contract.

Furthermore, UCC Section 2-209 issues aside, there is a material factual dispute as to whether manroland performed as required to be entitled to demand the second payment. The Contract states that the second payment of $1,124,930.00 is due "prior to shipment ex works." (R. 1-1, Machinery Contract, Addendum A.) Additionally, although the record demonstrates that manroland AG shipped the Printing Press from the factory, it is not clear that the Printing Press was shipped in a complete state. (R. 46, Koursa's Facts, Ex. 49, MANR002943; R. 46, Koursa's Facts, Ex. 55, MANR000280-81.) The Machinery Contract is silent as to the precise state that the Printing Press was required to be in prior to Koursa's second payment being due,

but the words "prior to shipment ex works" can reasonably be construed to require that the Printing Press be ready to ship in a complete state prior to payment. *See, e.g.*, *Petroleum Exploration Int'l, S.A. v. Canrig Drilling Techs., Ltd.*, Civil Action No. 08-1283, 2009 WL 4716043, at *2 (S.D. Tex. Dec. 7, 2009) ("It is completely implausible that Defendant under this contract [which required payment upon 'delivery ex works'] could have performed on . . . delivery without having also delivered the [completed machine] itself."). Thus, the Court concludes that there is a genuine issue of fact as to the precise state the Printing Press was required to be in, and the precise state it was actually in, at the time it shipped and whether the Contract obligated Koursa to render the second payment given the state of the Printing Press at the time it shipped.

CONCLUSION

For the foregoing reasons, manroland's motion for summary judgment (R. 37) and Koursa's motion for summary judgment (R. 44) are both DENIED. In light of this opinion, the parties are requested to reevaluate their settlement positions and exhaust all efforts to settle this case. Furthermore, a status hearing is set for October 15, 2013 at 9:45 A.M. to set firm pre-trial conference and trial dates.

**Entered:** _____

**Chief Judge Ruben Castillo**

**United States District Court**

**Date: September 30, 2013**